

Villanova University School of Law

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-4-2006

# Bright v. Westmoreland

Precedential or Non-Precedential: Precedential

Docket No. 05-2005

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"Bright v. Westmoreland" (2006). *2006 Decisions.* Paper 1194.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/1194

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL


IN THE UNITED STATES COURT
OF APPEALS
FOR THE THIRD CIRCUIT

_____

NO. 05-2005

_____


JOHN BRIGHT, Individually and in his capacity as
Administrator of the ESTATE OF ANNETTE BRIGHT,
deceased,
Appellant

v.

WESTMORELAND COUNTY; TAMI WHALEN,
Individually and in her capacity as a
Probation Officer for Westmoreland County; RICHARD
YESKO, Individually and in his capacity as a Probation
Officer for Westmoreland County; ANTHONY C. GUINTA,
Individually and in his capacity as Probation Supervisor for
Westmoreland County; CITY OF MONESSEN; CARL
FRANZAGLIO, Individually and in his capacity as a Police
Officer for the City of Monessen; PAUL S. KUNTZ,
Individually and in his capacity as Court Administrator for the
Westmoreland County Court of Common Pleas; JOHN
PECK, Individually and in his capacity as District Attorney of
Westmoreland County; CHARLES KOSCHALK

_____

On Appeal From the United States District Court
For the Western District of Pennsylvania
(D.C. Civil Action No. 03-cv-01072)
District Judge:  Hon. Arthur J. Schwab

---

Argued October 19, 2005

BEFORE: SMITH, STAPLETON and NYGAARD,
<u>Circuit Judges</u>

(Opinion Filed April 4, 2006)

---

Peter M. Suwak (Argued)
P.O. Box 1
Pete's Surplus Building
Washington, PA 15301
 Attorney for Appellant

Thomas P. Pellis (Argued)
Meyer, Darragh, Buckler, Bebenek & Eck
114 South Main Street
Greensburg, PA 15601
 Attorney for Appellees Westmoreland
 County, Tami Whalen, Richard Yesko,
 Anthony C. Guinta and John Peck

Thomas P. McGinnis (Argued)
Thomas, Thomas & Hafer
301 Grant Street
One Oxford Centre - Suite 1150
Pittsburgh, PA 15219
 Attorney for Appellees City Of Monessen,
 and Carl Franzaglio

Mary E. Butler (Argued)
Supreme Court of Pennsylvania
Administrative Office of PA Courts
1515 Market Street - Suite 1414
Philadelphia, PA 19102
 Attorney for Appellee
 Paul S. Kuntz

_____

OPINION OF THE COURT

_____

STAPLETON, Circuit Judge:

John Bright, on behalf of himself and his daughter Annette's estate, appeals from an order dismissing his complaint for failure to state a claim. That complaint purports to allege a Substantive Due Process claim under the "state-created danger doctrine" and several state law claims. For present purposes, we accept the facts alleged in Bright's

complaint as true.  Based on those facts, we will affirm the judgment of the District Court.

## I.

Thirty-four-year-old defendant Charles Koschalk ("Koschalk") pled guilty to a charge of corrupting the morals of a twelve-year-old girl, Annette Bright's sister.  He was sentenced to 23 months of probation.  As conditions of his probation, he was to have no contact with his 12-year-old victim and no unsupervised contact with any other minor.  On probation, Koschalk was under the supervision of Westmoreland County Adult Probation Department and three of its employees – defendants Tami Whalen, Richard Yesko, and Anthony Guinta.  During his probation, Koschalk continuously violated his parole by attempting to carry on a relationship with the 12-year-old victim of his crime.

The complaint alleges the following with respect to one of those probation violations and the ensuing proceedings:

16.  On or about MAY 4, 2001, AT 20:09 hrs, Defendant Probation Officer Tami Whelan personally observed and confronted Defendant Koschalk with the twelve year old victim, unsupervised, at the Target Store in Greensburg.  The probation officer considered this a direct violation of the Court Order.

17.  Defendant Probation Officer Whelan

4

prepared a report in support of a violation petition on or about May 16, 2001.

18. On or about June 15, 2001, a formal violation document alleging the above unauthorized contact was signed by Probation Officer Richard Yesko for Probation Officer Whelan.

19. On or about June 18, 2001, Probation Supervisor Anthony C. Guinta signed the violation document requesting that a final revocation hearing be scheduled for Defendant Koschalk.

20. On or about June 27, 2001, a Petition to Revoke Defendant Koschalk's probation was filed through Defendant District Attorney's office by and through an assistant district attorney.

21. On or about August 6, 2001, the Westmoreland County Court Administrator's Office issued a notice that a hearing on the Petition for Revocation was scheduled for August 28, 2001 before the Honorable William J. Ober of the Court of Common Pleas of Westmoreland County.

First Amended Complaint, App. at 54a-55a.

5

In late June, 2001, Bright called defendant Officer Carl Franzaglio of the City of Monessen Police Department to ask him to arrest Koschalk. Officer Franzaglio had some familiarity with the case because he was the prosecuting officer in the proceeding against Koschalk stemming from his crime against the 12-year-old. After Bright described the situation, Officer Franzaglio assured Bright that immediate action would be taken, but no detention of Koschalk occurred.

On July 15, 2001, before his probation revocation hearing was scheduled, Koschalk shot and killed Annette Bright, the eight-year-old sister of the victim of his earlier crime. Koschalk murdered Annette Bright to retaliate against the family for its efforts to prevent him from seeing the 12-year-old victim.

Bright's complaint concludes its statement of a claim under 42 U.S.C. § 1983 with the following allegations:

> The aforementioned acts, coupled with the inexplicable delay of nearly ten weeks in processing the revocation petition and/or the failure to initiate arrest and/or detention in the face of known probation violations . . . constituted a state-created danger . . . . The homicide was directly and proximately caused by the affirmative acts and/or the deliberate indifference and/or failure to enforce, despite actual knowledge, the court-ordered conditions of probation. Further, the effect of direct

confrontation with Koschalk, coupled with the aforementioned inexplicable delay emboldened Koschalk into believing that he would not confront effective law enforcement action as he progressed with his scheme to retaliate against the Bright family.

First Amended Complaint at ¶¶ 30(h), 31, App. at 58a.

In addition to the violation of Annette Bright's federal civil rights, Bright's complaint also alleges state law wrongful death and survival claims against all of the defendants and assault and battery claims against Koschalk.

The District Court granted the defendant's Rule 12(b)(6) motion to dismiss the § 1983 state-created danger claims. It concluded that these claims "must fail . . . because the state actors did not use their authority to create an opportunity for harm that would not otherwise have existed." District Ct. Op., App. at 13a-14a. The District Court also dismissed Bright's state law claims against the state-actor defendants on the ground that they were entitled to immunity under the Pennsylvania Political Subdivision Tort Claims Act, 42 Pa. Cons. Stat. § 8541, *et seq.* ("PPSTCA"). Finally, the District Court declined to exercise supplemental jurisdiction over the state law claims against Koschalk. This timely appeal followed.

## II.

We begin our evaluation of Bright's "state-created

7

danger" claim with a review of the Supreme Court's decision in *DeShaney v. Winnebago Cty. Soc. Servs. Dept.*, 489 U.S. 189 (1989). Joshua DeShaney was physically abused by his father. The respondents, social workers and local officials, had ample reason to believe Joshua's father was abusing him and, at one point, secured temporary custody of Joshua. They ultimately returned Joshua to his father, however, and the violence continued, resulting in severe brain damage. Joshua and his mother "sued respondents claiming that their failure to act deprived [Joshua] of his liberty in violation of the Due Process Clause of the Fourteenth Amendment." *Id.* at 191. The Supreme Court held that it did not, and affirmed a summary judgment for the respondents.

Based upon its text, history, and case law, the Court concluded that the Due Process Clause did not impose an affirmative obligation on the state to protect its citizens:

> The Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security. It forbids the State itself to deprive individuals of life, liberty, or property without "due process of law," but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means. Nor does history support such an expansive reading of the constitutional text.

\* \* \*

8

> Its purpose was to protect the people from the
> State, not to ensure that the State protected them
> from each other.

* * *

> Consistent with these principles, our
> cases have recognized that the Due Process
> Clauses generally confer no affirmative right to
> governmental aid, even where such aid may be
> necessary to secure life, liberty, or property
> interests of which the government itself may not
> deprive the individual.

*DeShaney*, 489 U.S. at 195-96.

Significantly for present purposes, the petitioners in *DeShaney* contended that, even if there was no affirmative duty to protect the public generally, "a special relationship" existed between Joshua and the state giving rise to such a duty "because the State knew that Joshua faced a special danger of abuse at his father's hands, and specifically proclaimed, by word and by deed, its intention to protect him against that danger." *DeShaney*, 489 U.S. at 197. The Supreme Court expressly "reject[ed] this argument." *Id.* at 198. It held that it is only when the state takes custody of a citizen, thereby depriving him of his liberty, that it assumes an affirmative duty to protect him or her from harm.

> [Our cases] stand only for the proposition that
> when the State takes a person into its custody

9

and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being. . . . The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf.

*Id.* at 199-200.

Applying these principles to Joshua's case, the Court concluded that the state had no duty to protect him even though state actors had, at one point, taken temporary custody of Joshua and then returned him to his father:

Petitioners concede that the harms Joshua suffered occurred not while he was in the State's custody, but while he was in the custody of his natural father, who was in no sense a state actor. While the State may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them. That the State once took temporary custody of Joshua does not alter the analysis, for when it returned him to his father's custody, it placed him in no worse position than that in which he would have been had it not acted at

all; the State does not become the permanent guarantor of an individual's safety by having once offered him shelter.

*DeShaney*, 498 U.S. at 201 (footnote omitted).

*DeShaney* stands for the proposition that the Due Process Clause imposes no affirmative duty to protect a citizen who is not in state custody.[1]  As the last quoted paragraph suggests, however, this does not mean that no constitutional violation can occur when state authority is affirmatively employed in a manner that injures a citizen or renders him "more vulnerable to injury from another source than he or she would have been in the absence of state intervention."  *Scheiber v. City of Philadelphia*, 320 F.3d 409, 416 (3d Cir. 2003).  This complement to the *DeShaney* holding has come to be known in its progeny as the "state-created danger doctrine."

Our case law establishes the following essential elements of a meritorious "state-created danger" claim:

(1) "the harm ultimately caused was foreseeable and fairly direct;"[2]

---

[1] Bright does not invoke the "state custody" exception to the general rule of *DeShaney*.  *Compare Nicini v. Morra*, 212 F.3d 798 (3d Cir. 2000) (holding that an affirmative duty to protect may exist in the context of foster care).

[2] *Kneipp v. Tedder*, 95 F.3d 1199, 1208 (3d Cir. 1996).

11

(2) a state actor acted with a degree of culpability that shocks the conscience;[3]

(3) a relationship between the state and the plaintiff existed such that "the plaintiff was a foreseeable victim of the defendant's acts," or a "member of a discrete class of persons subjected to the potential harm brought about by the state's actions," as opposed to a member of the public in general;[4] and

(4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.[5]

---

[3] *County of Sacramento v. Lewis*, 523 U.S. 833 (1998); *Miller v. City of Philadelphia*, 174 F.3d 368, 375-76 (1999); *Scheiber v. City of Philadelphia*, 320 F.3d 409, 416 (2003).

[4] *Kneipp*, 95 F.3d at 1209, n.22; *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906, 913 (3d Cir. 1997).

[5] *See DeShaney*, 489 U.S. at 201 ("While the State may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them. . . . [The State] placed him in no worse position than that in which he would have been had it not acted at all"); *Rivas v. City of Passaic*, 365 F.3d 181, 195 (3d Cir. 2004) (articulating the fourth element as requiring that

12

It is important to stress, for present purposes, that under the fourth element of a state-created danger claim, "[l]iability under the state-created danger theory is predicated upon the states' *affirmative acts* which work to the plaintiffs' detriments in terms of exposure to danger." *D.R. by L.R. v. Middle Bucks Area Vo. Tech. School*, 972 F.2d 1364, 1374 (3d Cir. 1992) (*en banc*) (emphasis supplied); *Brown v. Grabowski*, 922 F.2d 1097, 1100-01 (3d Cir. 1990) (finding that *DeShaney* holds "that a state's failure to take affirmative action to protect a victim from the actions of a third party will not, in the absence of a custodial relationship . . . support a civil rights claim"). It is misuse of state authority, rather than a failure to use it, that can violate the Due Process Clause.

While we have acknowledged that the line between action and inaction may not always be clear, *D.R.*, 972 F.2d at 1374, we have never found a state-created danger claim to be meritorious without an allegation and subsequent showing

---

"the state actor used his authority to create an opportunity for danger that otherwise would not have existed"). *See also* Laura Oren, *Safari into the Snake Pit:  The State Created Danger Doctrine*, 13 Wm. & Mary Bill Rts. J. 1165, 1187 (2005) (arguing that this element in our Circuit's state-created danger doctrine "may be broken down into its constituent parts:  (1) Did state officials exercise authority or power; (2) in such a way that they put someone in a worse position than they would otherwise have occupied?").

that state authority was affirmatively exercised.[6]  Contrary to Bright's suggestion, *Kneipp v. Tedder*, 95 F.3d 1199 (3d Cir.

---

[6] If there were any inconsistency in the holdings of our prior cases regarding the fourth element of a state-created danger claim, the controlling precedent would be our *en banc* decision in *D.R. by L.R. v. Middle Bucks Area Vo. Tech. School*, 972 F.2d 1364 (3d Cir. 1992).  While acknowledging that the line between action and inaction is sometimes difficult to draw, we there affirmed what *DeShaney* clearly teaches:  the Due Process Clause proscribes only state action and, accordingly, liability "under the state-created danger theory [can only] be predicated upon the state's affirmative acts which work to plaintiffs' detriment in terms of exposure to danger."  972 F.2d at 1374. We perceive no conflict, however, between *D.R.* and those cases which phrase the fourth element in terms of whether "state actors used their authority to create an opportunity that would not otherwise have existed" for injury to the plaintiff.  *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1152 (3d Cir. 1995).  In our view, "state actors" cannot "use their authority" to create such an opportunity by failing to act.  *Rivas* is not to the contrary. There, two state actors, emergency medical technicians, affirmatively used their state authority to create an opportunity for injury to the plaintiff by summoning the police and providing them with information that could be expected to cause the police to treat the plaintiff's decedent in a highly dangerous manner – *i.e.*, "Garcia and Rodriguez informed the police that Mr. Rivas had assaulted one of them but did not inform the police about Mr. Rivas's medical condition or warn the officers that Mr. Rivas should not be restrained."  365 F.3d at 195.  We perceive little similarity between that case and this.

14

1996), and *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902 (3d Cir 1997), do not indicate otherwise. In *Kneipp*, the police stopped a couple on the street in the middle of the night for causing a disturbance. The wife was intoxicated to the point of being unable to walk without assistance. While the police initially detained both of them, they subsequently gave the husband permission to go home. He departed, assuming that the police were going to take her either to the hospital or the police station. At some point after his departure, the police sent the wife home alone, resulting in her fall to the bottom of an embankment and serious injury. We affirmed, finding that there was "sufficient evidence in the summary judgment record to show that . . . the police officers used their authority as police officers to create a dangerous situation or to make [the wife] more vulnerable to danger [than] had they not intervened. . . . As a result of the affirmative acts of the police officers, the danger or risk of injury to [the wife] was greatly increased." *Kneipp*, 95 F.3d at 1209.

In *Morse*, we characterized the issue raised under the fourth element of a state- created danger claim as whether "the state actors 'used their authority to create an opportunity that otherwise would not have existed for the third party's crime to occur.'" *Morse*, 132 F.3d at 915 (quoting from *Marks v. Borough of Hatboro*, 51 F.3d 1137, 1152 (3d Cir. 1995)). We affirmed the District Court's dismissal of the complaint, however, based on the plaintiff's failure to satisfy the first element of a state-created danger claim, *i.e.*, on the facts alleged, the third parties' "deadly attack was not a foreseeable and fairly direct result of defendants' behavior."

15

*Id.* at 915-16.[7]

_____

[7] As the dissent notes, *Morse* observes: "the dispositive factor appears to be whether the state has in some way placed the plaintiff in a dangerous position that was foreseeable, and not whether the act was more appropriately characterized as an affirmative act or an omission." *Morse*, 132 F.3d at 915. It is important to put this observation in context, however. This sentence appears in *Morse*'s discussion of the district court's application of the fourth element of the test. The district court identified a single alleged affirmative act—the defendants having unlocked the back door to a school through which the plaintiff's attacker entered—and expressed uncertainty as to whether this affirmative act was sufficient to establish liability. We concluded the question of whether an affirmative act was required had been answered by *Mark v. Borough of Hatboro. Mark* articulated the fourth element of the test as requiring that "state actors used their authority to create an opportunity that otherwise would not have existed for the third party's crime to occur." *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1152 (3d Cir. 1995). A use of authority that creates an opportunity for harm necessarily entails an affirmative act. But an affirmative act, while necessary, is not sufficient. The test also requires a direct causal relationship between the affirmative act and foreseeable harm to the plaintiff. In *Morse*, this meant asking whether unlocking the door created a foreseeable opportunity for the plaintiff to be attacked by a mentally ill intruder. Only then would the state actor have "used its authority to create an opportunity which otherwise would not have existed for the specific harm to occur." *Morse,* 132 F.3d at 914. In this context, we do not read *Morse*'s language to suggest liability can be

## III.

Bright insists that the state actor-defendants caused Annette Bright's death in three ways: (1) the "inexplicable delay" by numerous state actors in pursuing the revocation of Koschalk's parole left him in a position to kill Annette; (2) Officer Franzaglio's assurance that Koschalk would be taken into custody was relied upon by Bright and resulted in Bright's failing to take steps to protect Annette; and (3) Officer Whalen's confrontation of Koschalk in May and the want of any prompt follow-up by the state actors "emboldened" him to commit a crime he otherwise would not have committed. Like the District Court, we find it unnecessary to consider anything other than the fourth essential element of a meritorious state-created danger claim.[8]

---

based on an omission alone or a failure to act. We read it to clarify that the relevant test involves asking whether a state actor's behavior constituted an affirmative act, and, if so, whether the affirmative act created a foreseeable opportunity for harm.

[8]Judge Smith would hold that the motion to dismiss was also properly granted based on Bright's failure to plead facts sufficient to satisfy the first prong of the state-created danger test. In his view, the harm ultimately caused was a not "foreseeable and a fairly direct result of the state's actions." *Morse*, 132 F.3d at 908. Because the crime of corrupting the morals of a minor is different in degree and kind from the crime of murder, it is not – without more – foreseeable to a state actor that failing to detain a pedophile will result in homicide. In

17

We conclude that the state cannot "create danger" giving rise to substantive due process liability by failing to more expeditiously seek someone's detention, by expressing an intention to seek such detention without doing so, or by taking note of a probation violation without taking steps to promptly secure the revocation of the probationer's probation.

## A.

Bright argues that this case is unique because "the probation officer personally witnessed the offending violation and was in a position to act promptly," but there was an "inexplicable delay" of ten weeks before a probation revocation hearing was scheduled. Br. Appellant at 26. This theory of liability based solely on a failure of the state to act is clearly foreclosed by *DeShaney*. Even if Officer Whalen's knowledge of the encounter at Target could be reasonably regarded as knowledge of a danger to Annette, we know from *DeShaney* that no affirmative duty to protect arises "from the State's knowledge of the individual's predicament." *DeShaney*, 489 U.S. at 200. Liability requires affirmative state action; mere "failure to protect an individual against private violence" does not violate the Due Process Clause. *Id.* at 197.

## B.

Judge Smith's view, because Bright failed to allege that state officials had any knowledge of any threatening or criminal conduct except the probation violation itself, Annette Bright's murder was not a foreseeable result of the state's action.

Officer Franzaglio assured Bright approximately three weeks before Annette's death that Koschalk would be arrested and "[i]n reliance upon these assurances, Bright failed to take defensive actions, such as leaving the area with his family, hence creating the opportunity for the damages ultimately sustained." First Amended Complaint ¶ 30(g)(2), App. at 58a. State-created danger liability cannot be predicated on these facts, however. The Supreme Court has spoken directly to this matter. Bright does not, and cannot, claim that the state in any way restricted his freedom to act on his family's own behalf. The *DeShaney* Court specifically held that, under these circumstances, no "affirmative duty to protect arises . . . from the State's . . . *expressions of intent to help*" an individual at risk. *DeShaney*, 489 U.S. at 200 (emphasis added). Once again, the governing rule is that there can be no liability in the absence of an affirmative exercise of state authority.

## C.

Finally, Bright alleges that the parole officer's "confrontation with Koschalk, coupled with . . . inexplicable delay emboldened Koschalk into believing that he would not confront effective law enforcement action as he progressed with his scheme to retaliate against the Bright family." First Amended Complaint ¶ 31, App. at 58-a. Here, again, Bright seeks to bring the law enforcement delay within the scope of the state-created danger doctrine by pointing to an affirmative action of the state which preceded it. The reality of the situation described in the complaint is that what is alleged to have created a danger was the failure of the defendants to

19

utilize their state authority, not their utilization of it. Bright has identified no action of the defendants that utilized their state authority in a manner that rendered Annette more vulnerable to Koschalk than she would otherwise have been. It is Officer Whalen's alleged decision not to arrest in May and the ensuing ten week delay about which Bright complains. It is that failure to arrest and detain that his brief argues created the danger, made Annette's death foreseeable, and was the product of deliberate indifference.

It is true, as we have noted, that Bright's complaint alleges in conclusory fashion that it was both Officer Whalen's "confrontation with Koschalk" *and* the "inexplicable delay" that "emboldened" Koschalk. Based on the allegations of the complaint as a whole, however, one cannot reasonably infer that there was any connection between Officer Whalen's accusing Koschalk of a probation violation and Koschalk's decision to murder Annette ten weeks later. It is specifically alleged that what "emboldened" Koschalk and thereby contributed to that decision was a belief "that he would not confront effective law enforcement action as he progressed with his scheme to retaliate." First Amended Complaint at ¶ 31, App. at 58a. It is the state's creation of that belief that is said to have rendered Annette more vulnerable than she would otherwise have been. We may assume for present purposes that the creation of that belief could reasonably be attributed to the ten week delay in serving Koschalk with notice of his probation violation hearing. It could not reasonably be attributed, however, to the probation officer's calling a probation violation a probation violation when confronted with it on May 4th.

While a probation officer here took affirmative action seeking compliance with the court's protective order, just as the social workers took affirmative action to secure and then relinquish custody of Joshua DeShaney, the Due Process Clause did not require that Westmoreland County "become the permanent guarantor" of the Bright family's safety from private violence any more than it required Winnebago County to "become the permanent guarantor" of Joshua's safety from the same sort of harm. *Id.* at 201. As in *DeShaney*, the only affirmative exercise of state authority alleged in this case – the so-called "confrontation" – "placed [the Brights] in no worse position than that in which [they] would have been had [the state] not acted at all." *Id.* In short, the Brights were at no greater risk immediately following the confrontation than they were when it commenced. With respect to the ensuing delay in exercising state authority, here, as in *DeShaney*, the "most that can be said of the state functionaries in this case is that they stood by and did nothing when . . . circumstances dictated a more active role for them." *DeShaney*, 489 U.S. at 203. The confrontation was not a misuse of state authority, and the subsequent failure to exercise state authority was not a violation of the Due Process Clause under *DeShaney*.

## IV.

Turning to Bright's state claims, the District Court determined that Westmoreland County, the City of Monessen, and the individual state employees were entitled to immunity from those claims. It further concluded that it should decline to exercise its supplemental jurisdiction with respect to Bright's claims against Koschalk.

On appeal, Bright does not challenge the merits of the District Court's determination that the county and city were entitled to municipal immunity. Rather, he insists that the Court, having dismissed the federal claims, should have declined to entertain any of Bright's state claims. With respect to the claims against the individual state defendants, Bright argues, in the alternative, that these defendants were not entitled to immunity under the PPSTCA. Finally, Bright insists that, if the District Court properly decided to determine the state claims against the county, the city, and their employees, it should not have abstained with respect to the claims against Koschalk.

## A.

While our Court reviews district court decisions to exercise supplemental jurisdiction for abuse of discretion, *see DeAsencio v. Tyson Foods, Inc.*, 342 F.3d 301, 311 (3d Cir. 2003), we have also found that:

> [W]here the claim over which the district court has original jurisdiction is dismissed before trial, the district court must decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so.

*Borough of West Mifflin v. Lancaster*, 45 F.3d 780, 788 (3d Cir. 1995).

The District Court recognized this rule and explained

that there were no "extraordinary circumstances" here that would "warrant the exercise of jurisdiction over the state claims" against Koschalk. App. at 19-a. While it did not expressly address why it was proceeding to exercise jurisdiction over the other state claims, we believe that the District Court's reason for distinguishing between the two classes of claims is both apparent and appropriate.

Governmental immunity – such as immunity for municipalities and for public employees acting within the scope of their duties under 42 Pa. Cons. Stat. §§ 8541, 8545 – serves the public interest in avoiding burdening the state and its employees with unnecessary litigation. Pennsylvania immunity law appears to be no exception. *See Kuzel v. Krause*, 658 A.2d 856, 858 (Pa. Commw. Ct. 1995) ("Sovereign and governmental immunity involve the constitutional question of the Commonwealth consenting to be sued and the effect those suits would have on the public purse . . . ."). *See also In re Upset Sale*, 522 Pa. 230, 232 (Pa. 1989) (finding the defense of municipal immunity non-waivable by litigants because "a governmental agency cannot be put at the mercy of negligent . . . waiver by counsel of a substantive right designed to protect its very existence"). The public interest protected by immunity doctrine has prompted our Supreme Court to advise that immunity issues should be resolved "early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive." *Saucier v. Katz*, 533 U.S. 194, 200 (2001).

Understandably, the state defendants filed their motions to dismiss the state claims on immunity grounds

23

shortly after learning of this action against them, and those motions were briefed and argued simultaneously with the motions to dismiss the § 1983 claims for failure to state a claim. Accordingly, at the point when the District Court concluded that the federal claims should be dismissed, it was in a position to rule without delay on the state defendants' entitlement to immunity. Given that any further delay in ruling on that entitlement would undermine an important objective of the state in recognizing such immunity, it is not surprising that the District Court exercised jurisdiction with respect to the motions of the state defendants while declining to do so with respect to Koschalk, who had no claim of immunity. In fairness to the state-actor defendants, the District Court could hardly have done otherwise.

**B.**

The District Court concluded that the individual state-actor defendants were entitled to immunity under PPSTCA because Bright's allegations "could not support a finding that the individual defendants 'intended to violate the law or bring about the harm that resulted to the plaintiffs.'" *Id.* at 17a (quoting from *Leidy v. Borough of Glenolden*, 277 F.Supp.2d 547 (E.D. Pa. 2003)). We agree.

Under § 8545 of the PPSTCA, a municipal employee "is liable for civil damages on account of any injury to a person or property . . . only to the same extent as his employing local agency . . . ." 42 Pa. Cons. Stat. § 8545. Local agencies are given broad immunity in 42 Pa. Cons. Stat. § 8541 which is qualified by eight exceptions that do not

24

apply to this case.  The PPSTCA contains an additional exception from immunity where a public employee is concerned:

> In any action against a local agency or employee thereof for damages on account of an injury caused by the act of the employee in which it is judicially determined that the act of the employee caused the injury and that such act constituted a crime, actual fraud, actual malice or willful misconduct, the provisions of sections 8545 . . . shall not apply.

42 Pa. Cons. Stat. § 8550.  "Willful misconduct" – the only clause that Bright argues describes the conduct of these defendants – has recently been defined as follows:

> Willful misconduct . . . has been defined by our Supreme Court to mean conduct whereby the actor desired to bring about the result that followed or at least was aware that it was substantially certain to follow, so that such desire can be implied. . . . To prove willful misconduct, a plaintiff must establish that the actor desired to bring about the result that followed, or at least it was substantially certain to follow, *i.e.*, specific intent.

*Robbins v. Cumberland County Children and Youth Services*, 802 A.2d 1239, 1252–53 (Pa. Commw. Ct. 2002).  Our Court has also recognized that "'[w]illful misconduct' in this

25

context has the same meaning as the term 'intentional tort.'" *Brown v. Muhlenberg Township*, 269 F.3d 205, 214 (3d Cir. 2001) (citing *Delate v. Kolle*, 667 A.2d 1218, 1221 (Pa. Commw. Ct. 1995) and *Kuzel v. Krause*, 658 A.2d 856, 859 (Pa. Commw. Ct. 1995)). Thus, even where a public employee acts with a degree of culpability equivalent to "recklessness," Pennsylvania law nevertheless affords him immunity. *Williams v. City of Philadelphia*, 569 A.2d 419, 421-22 (Pa. Commw. Ct. 1995) ("[T]he failure [of two public employees] to take greater precautionary measures in light of the circumstances, exemplifies a reckless disregard of the existing danger; however, that behavior constitutes wanton, not willful, misconduct. . . . [T]hey are immune from liability under section 8545 of the Code.").

Bright does not allege that the individual state defendants desired to bring about harm to Annette Bright (or to her sister) or that they were aware that such harm "was substantially certain to follow." Rather, Bright alleges in his complaint that they acted with "deliberate indifference," App. at 58a, and argues in his brief that they "knowingly and deliberately disregarded a known risk." Br. Appellant at 26. Assuming *arguendo* that a reasonable jury could infer such culpability from the facts alleged, the individual state-actor defendants would still not have engaged in "willful" misconduct and would still be entitled to immunity.

## C.

Bright has pointed to no considerations of judicial economy, convenience, or fairness to the parties which would

26

have provided the District Court with an affirmative justification for adjudicating the claims against Koschalk after dismissing the federal claims. And we perceive none.

## V.

The judgment of the District Court will be affirmed.

*BRIGHT V. WESTMORELAND COUNTY* - NO. 05-2005

NYGAARD J., dissenting:

I believe that the majority incorrectly states the elements of our state-created danger exception in such a way that leads them to incorrectly identify the dispositive inquiry that drives our state-created danger test. This mis-focus, in turn, has caused them to make analytical missteps in assessing the adequacy of the claim presented in this case. It is axiomatic that the pleadings in this case must be taken in their entirety in ruling upon a motion under Rule 12(b)(6). In my view, when assessed cumulatively, they establish not only the existence of affirmative acts, but more importantly, that the state used its authority to place the plaintiff in a position of enhanced danger, thereby meeting the fourth element of the state-created danger test. Hence, I respectfully dissent.

## I. The Fourth Element of the State-Created Danger Test

The majority submits that the test developed in our Circuit to assess the adequacy of a state-created danger claim contains the word "affirmatively." Specifically, they state the fourth element of the test as whether:

> (4) a state actor *affirmatively* used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.

Maj. Op. at 9 (emphasis added). This, quite plainly, is an incorrect statement of our test. Since *Kneipp v. Tedder*, 95 F.3d 119 (3d Cir. 1996) enunciated our state-created danger

28

test, not one of our cases has inserted the word "affirmatively" into the fourth element of the test.[9]  *See Mark v. Borough of Hatboro*, 51 F.3d 1137, 1152 (3d Cir. 1995) ("Cases like these have four things in common: ... (4) the state actors used their authority to create an opportunity that otherwise would not have existed for the third party's crime to occur."); *Kneipp*, 95 F.3d at 1205  (applying the *Mark* 4-part test); *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 908 (3d Cir. 1997) (quoting and applying the *Mark* 4-part test); *Smith v. Marasco*, 318 F.3d 497, 506 (3d Cir. 2003) (noting the fourth element of the *Kneipp* test as, "(4)[whether] the state actors used their authority to create an opportunity that otherwise would not have existed for the third party's crime to occur."); *Scheiber v. City of Philadelphia*, 320 F.3d 409, 417 (3d Cir. 2003) (quoting the *Kneipp* test); *Rivas v. City of Passaic*, 365 F.3d 181, 197 (3d Cir. 2004) ("The last element of the *Kneipp* test asks whether the state actor used his or her authority to create an opportunity, which otherwise would not have existed, for the specific harm to occur.").  The majority does not cite, nor can I find, any case or other form of support for its claim, today, that the test that our Circuit has developed

---

[9]Our initial attempt to establish a test for the state-created danger exception to *Deshaney v. Winnebago Cty. Servs. Dept.*, 489 U.S. 189 (1989) can be traced to  *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1152 (3d Cir. 1995) even though it has, since *Kneipp*, been known as the *Kneipp* test.  Recently, Judge Ambro accurately charted modifications to our test, leading him to question the appropriateness of continuing to refer to the *Deshaney* exception as the *Kneipp* test.  *See Rivas v. City of Philadelphia*, 365 F.3d 181, 202-03 (3d Cir. 2004).

includes the word "affirmatively" in the fourth element.

## II. The Central Inquiry and Analysis Under the Fourth Element

By its insertion, the majority signals its belief that the hallmark inquiry under the fourth element is whether the state's actions can be characterized as affirmative or not.[10] As I address below, this assertion stands quite starkly in contrast to the dispositive inquiry for addressing the state-created danger exception established by our Court.[11]

---

[10]The majority states, "[i]t is important to stress, for present purposes, that under the fourth element of a state-created danger claim, '[l]iability under the state-created danger theory is predicated upon the states' *affirmative* acts which work to the plaintiffs' detriments in terms of exposure to danger.'" Maj. Op. at 10 (citations omitted).

[11]I am not suggesting that the presence of an affirmative act does not play a part in our state-created danger inquiry. To satisfy the fourth element, there still must be something more than simple inaction by the state even "when suspicious circumstances dictate[] a more active role." *Deshaney*, 489 U.S. at 203. However, this inquiry is limited in its effectiveness. As I discuss below, to hold that the mere *presence* of omissive acts abrogates any ability to satisfy the fourth element, especially when combined with other affirmative conduct, misconceives the nature of our test and the language from which the state-created danger exception derives: "[w]hile the state may have been aware of the dangers that Joshua faced in the free world, it

Our recent cases have shifted away from inquiring into the existence of affirmative acts as a standard to establish the fourth element of our test for a compelling reason: to so hinge our inquiry would center us squarely within the troublesome decisional thicket governing the distinction between action and inaction.[12] Writing for the Court in *Morse*, Chief Judge Scirica addressed the significance of this dilemma:

> one of the common factors in cases addressing the state-created danger is that the state actors "used their

_____

played no part in their creation, nor did it do anything to render him any more vulnerable to them." *Id.* at 201.

[12] When the *Mark* Court formulated, for the first time, our Circuit's test for the state-created danger exception, it did so in full recognition of the United States Court of Appeals for the Seventh Circuit's articulation in *Bowers v. DeVito*, 686 F.2d 616 (7th Cir. 1982):

> We do not want to pretend that the line between action and inaction, between inflicting and failing to prevent the infliction of harm, is clearer than it is. If the state puts a man in a position of danger from private persons and then fails to protect him, it will not be heard to say that its role was merely passive; it is as much an active tortfeasor as if it had thrown him into the snake pit.

*Bowers*, 686 F.2d at 618. These words ring true today. As I explain later, the claim at issue in this case is exactly that the state put a person in a position of danger and then failed to protect them. To characterize this as a merely passive act is overtly wrong.

31

authority to create an opportunity that otherwise would not have existed for the third party's crime to occur." *The dispositive factor appears to be whether the state has in some way placed the plaintiff in a dangerous position that was foreseeable, and not whether the act was more appropriately characterized as an affirmative act or omission.*

*Morse*, 132 F.3d at 915 (emphasis added) (citations omitted). In *Morse*, we rejected the affirmative act/omission inquiry because of the difficulty it posed in reaching sound conclusions. *Id*. at 914 (noting that "[c]onduct that has been held to be an affirmative act under one set of facts has not met that standard in a similar setting."). And we criticized the District Court for reading the fourth element "to contemplate that a state actor must affirmatively act to create the risk which results in harm to the plaintiff." *Id*. at 914. We also explicitly recognized that the question of whether an affirmative act is required had already been answered. *Id*. at 915 ("[w]hether an affirmative act rather than an act of omission is required ... ha[s] been answered by *Mark*"). Consequently, as *Morse* represents a controlling case, I cannot join in the majority's assertion to the contrary, that the hallmark of our test is whether the acts can be characterized as affirmative.

Morse is not the only controlling case the majority elides. *Rivas* reflects our most recent chance to address the state-created danger exception and further cements *Morse's* rejection of the affirmative act/omission inquiry. There, Emergency Medical Technicians ("EMTs") called for police backup after encountering a severely psychotic and

32

convulsing middle-aged man.  Upon the police officers' arrival, the EMTs informed them that the man, Mr. Rivas, had assaulted one of the EMTs.  They failed to advise the police, however, that Mr. Rivas had a medical condition that explained his actions, and the EMTs then abandoned control over the situation.  After an altercation with the police, Mr. Rivas was placed on stretcher and at some point stopped breathing and died.  We found that the EMTs' conduct, taken cumulatively, satisfied the fourth element of the state-created danger test.  Specifically, we concluded that the conduct "created an opportunity for harm that would not have otherwise existed" and that "were it not for those acts, Mr. Rivas presumably could have remained in the apartment's bathroom for the duration of his seizure without incident." *Rivas*, 365 F.3d at 197.

Looking closely at the relevant conduct in *Rivas*, it is clear that our approach under the fourth element of the state-created danger exception now rests some distance away from the affirmative act/omission inquiry.  In *Rivas*, the conduct we found to have met the fourth element of the test involved an initial act by the EMTs - calling and informing the officers of Mr. Rivas' assault on one of the EMTs - and then two omissions - not advising the officers of Mr. Rivas' medical condition and abandoning control over the situation.  We found this conduct to have met the fourth element of the test despite, or rather in spite of, any act/omission characterization that might have been made.  Thus, *Rivas* stands both for our Court's shift away from the affirmative act/omission inquiry and also for the proposition  that the conduct must be looked at in its entirety to determine whether the state placed the

plaintiff in a position of enhanced danger.

Today's case presents a set of pleadings which, if proven, would establish nearly identical conduct as that analyzed in *Rivas*. Bright claims that the initial confrontation between Koschalk and his parole officer, while Koschalk was violating his parole, and then the failure by that parole officer to take appropriate action on this violation emboldened Koschalk to believe he could act with impunity in carrying out his increasingly delusional and violent threats and plans. The conduct alleged here, when taken together, contains both an initial act - the confrontation between the parole officer and Koschalk - and then an omission - the parole officer's abdication of his responsibility to take action on a clear parole violation.

We cannot simply annul *Rivas'* prescription that it is the totality of the conduct that must be analyzed under the fourth element of the state-created danger exception. The majority dismisses Bright's claim on the basis that "Bright has identified *no action* of the defendants that utilized their state authority in a manner that rendered Annette more vulnerable to Koschalk than she otherwise would have been" and that "it is the ensuing ten week delay about which Bright complains." Maj. Op. at 15 (emphasis added). I am at a loss to understand how, based on the pleadings here, the majority could claim that there is "*no action* of the defendants that utilized their state authority in a manner that rendered Annette more vulnerable" to harm. Bright has repeatedly and specifically claimed that the confrontation itself was the trigger for

increasing Koschalk's disposition to violence.[13]  Had there been no confrontation but rather merely a delay of enforcement, Bright could not successfully claim that Koschalk was emboldened to act more violently.[14]  Instead,

---

[13]As this appeal comes to us on a Rule 12(b)(6) motion, I cannot accept the majority's conclusory dismissal of the plaintiff's allegations. Bright must only satisfy the liberal notice pleading requirements under Rule 8(a). *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512-13 (2002).  Accordingly, we are bound not to dismiss the complaint "unless it appears beyond doubt that  the plaintiff can prove no set of facts in support of his claims which would entitle him to relief." *Conley v. Gibson*, 335 U.S. 41, 45–46 (1957).  Additionally, we are bound to construe all reasonable inferences in favor of the plaintiff. *See id.*  Thus, for the purposes of this case, we should not dismiss Bright's claims if the sum of all alleged facts would show that the state used its authority in a way that created a danger to the plaintiff  or that rendered the plaintiff  more vulnerable to danger than had the state not acted at all.

[14]Indeed, had Bright's claim alleged merely that the parole officer's failure to arrest Koschalk created an opportunity for harm that would not have otherwise existed, this would have been an easy case.  Such a claim would clearly fail under the state-created danger doctrine, precisely because there would have been nothing to support the requirement that the state have placed the plaintiff in a position of enhanced danger.  Such a pleading would be governed by *Deshaney's* rule requiring something more than mere idleness, even where circumstances

35

the confrontation itself plays an integral role in creating an opportunity for harm that would otherwise not have existed, placing this case outside the purview of *Deshaney* and firmly within the ambit of our state-created danger exception.

To highlight my problem with the majority's logic, if we applied it to the facts in *Rivas* it would read something like this: "the fault Rivas finds is solely with the EMTs' failure to disclose certain information and the abdication of responsibility. Because there is nothing affirmative in these acts, the claim cannot be sustained." The majority's approach, emphasizing as it does the necessity of characterizing acts as affirmative, only underscores its inadequacies. By cabining Bright's claim as based *solely* on an ensuing delay in taking action, the majority lops off the initial affirmative act so it can conclude that there was no affirmative act. I fail to understand how this analysis at all resembles the meaning of our fourth element inquiry.

Without belaboring the point more, the basis of Bright's claim is that the affirmative confrontational act, like the initial act of the EMTs in *Rivas*, taken together with the ensuing conduct, created an opportunity for harm that otherwise would not have existed, thus surpassing the threshold necessary to meet the fourth element of the state-created danger test. Regardless of whether Bright can ultimately prove this, if our test is to have any content, he is at least entitled to try.

---

dictate a more active role, in order for a claim to be stated. *See Deshaney*, 489 U.S. at 203.

### III. Emboldenment Claims under the State-Created

### Danger Exception

This appeal poses the question of whether our state-created danger exception supports a theory of emboldenment. Our Court has never addressed, head on, this specific question.

As the above analysis makes clear, Bright's claim, for the purposes of the fourth element of the state-created danger claim, is analogous to *Rivas*. Because we held that the claim in *Rivas* met the fourth element of the state-created danger test, so too, we must hold here. Implicit in my conclusion, then, is the belief that our state-created danger exception allows for a claim premised on an emboldenment theory. To hold otherwise would render the render the state-created danger exception logically and analytically inconsistent.

The majority rejects Bright's emboldenment claim by responding that, despite the pleadings to the contrary, Bright is unable to bring his claim within the state-created danger exception. This simple assertion, without more, is insufficient.

Importantly, the difference between *Rivas* and this case is not in the nature of the relevant conduct - in each case the plaintiff has pleaded a combination of affirmative acts and omissions - or in the general effect that the conduct has had on the situation - in each case the claimed effect was that the plaintiff was placed in a situation of enhanced danger.

Instead, the only difference is in the theory of how the claimed conduct placed the plaintiff in a position of enhanced danger. In *Rivas*, the alleged behavior put the plaintiff in a position of enhanced danger because the EMTs called the police and only disclosed certain information about the nature of the situation - information which affected the way the officers handled the situation - and then abandoned control over the event. We might say that this claim is premised on a theory of misrepresentation; that is, the EMTs' misrepresentation to the officers enhanced the danger to the plaintiff because it created a situation where the officers would act more violently. Here, Bright's claim is premised on a theory of emboldenment: the increased danger arose from Koschalk's confrontation with his parole officer and ensuing lack of effective enforcement because it emboldened Koschalk to act more violently.

I can see no logical or analytical reason to allow Rivas' claim and not Bright's. For the purposes of the fourth element, there is simply no functional difference between the two claims, precisely because the result is the same. In both, the state has acted to place the plaintiff in a position of increased danger. True, the claims posit different theories as to why the plaintiff was placed in a position of enhanced danger, but nevertheless, both establish the claim that, but for the state's conduct, the plaintiff would not have been placed in that position at all. Because our inquiry under the fourth element asks exactly this, both claims meet the test.

## IV.

38

When viewed in light of our jurisprudence and our current position on the proper inquiry for the state-created danger exception, the majority's initial insertion takes on a significantly different character and changes materially our inquiry. By inserting the word "affirmatively," the majority reworks not only the actual language of our test, but also our central inquiry in light of *Morse* and *Rivas*.

Moreover, until today our case law has evidenced an unambiguous shift away from reliance on the frustratingly murky distinction between affirmative action and omission. I fear that with a single insertion, the majority succeeds in pulling us right back in. We have consciously and, I believe, prudently moved away from this distinction precisely because of the difficult and often fruitless analysis required therefrom. Thus it is true, as the majority asserts, that "[i]t is the misuse of state authority, rather than a failure to use it, that can violate the Due Process Clause." Maj. Op. at 10. But this statement proves too much. It exposes the principle, established in *Morse* and *Rivas*, that the central inquiry of our state-created danger test is whether the state placed the plaintiff in a position of enhanced danger. We cannot ignore this principle because we believe the inquiry should be something else. It is true that the Court in *Deshaney* sought impartiality in the face of "natural sympathy." *Deshaney*, 489 U.S. at 212. Importantly for the plaintiffs in this case, however, we should not plunder whatever merit that exhortation may have had. Tragedy should not incite illegitimate influence; yet neither should it be dismissed before it has had a chance to plead its case.

Upon the foregoing, I respectfully dissent.