

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-22-2007

# Estate of Bennett v. Philadelphia

Precedential or Non-Precedential: Precedential

Docket No. 06-2879

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

## Recommended Citation

"Estate of Bennett v. Philadelphia" (2007). *2007 Decisions.* Paper 494.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/494

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

Nos. 06-2879 and 06-2978

———

ALEXUS BENNETT, ALIYAHA BENNETT,
PRISCILLA BENNETT, Minors, by and through
their Guardian Ad Litem JONATHAN IRVINE,
Appellants in No. 06-2978

v.

CITY OF PHILADELPHIA

———

THE ESTATE OF PORCHIA BENNETT,
Decedent, by and through the Administrator
of the Estate, THOMAS BRUNO, Esq.,
Appellant in No. 06-2879

v.

CITY OF PHILADELPHIA; JOE MAIDEN

———

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil Nos. 03-cv-05685 and 05-cv-00833)
District Judge:  Hon. Berle M. Schiller

———

Argued July 10, 2007

Before:  SLOVITER, WEIS, and ROTH, Circuit Judges

(Filed August 22, 2007 )

———

Teri B. Himebaugh  (Argued)
Abramson & Deneberg, P.C.
1200 Walnut Street,  Sixth Floor
Philadelphia, PA 19107

      Attorney for Appellant,
      The Estate of Porchia Bennett

Christopher J. Culleton      (Argued)
Allan H. Gordon
Kolsby, Gordon, Robin, Shore & Bezar
1650 Market Street, 22nd Floor
One Liberty Place
Philadelphia, PA 19103

      Attorneys for Appellants,
      Alexus Bennett, Aliyaha Bennett
      and Priscilla Bennett

Romulo L. Diaz, Jr.
      City Solicitor
Jane Lovitch Istvan  (Argued)
      Senior Attorney, Appeals
City of Philadelphia Law Department
1515 Arch Street, 17th Floor
Philadelphia, PA 19102-1595

      Attorneys for Appellee,
      City of Philadelphia

Richard G. Tuttle, Esq.
Archer & Greiner
One South Broad Street, Suite 1620
Philadelphia, PA 19107

      Attorney for Appellee,
      Joe Maiden

OPINION OF THE COURT

2

SLOVITER, <u>Circuit</u> <u>Judge</u>.

One of the essential principles inherent in a multi-layered judicial system is the requirement to adhere to legal decisions pronounced by the highest court: in the case of the federal courts, that is the Supreme Court of the United States. Those decisions are supported by sound reasoning, and lower federal courts generally have no difficulty in applying the precedent. Occasionally, however, the factual situation in which the principle is tested is heartrending, tempting the judge to seek a way to circumvent the principle. This is one such case.[1]

## I.

We borrow this background section almost verbatim from the text of the unreported opinion of the District Court (Judge Berle M. Schiller) because it is accurate and requires no elaboration.

### A. Iyonnah

Tiffany Bennett had five daughters: Alexus (born January 9, 1993), Iyonnah (born October 29, 1994), Aliyaha (born October 3, 1996), Priscilla (born January 12, 1999) and Porchia (born July 7, 2000). In December 1994, Iyonnah suffered brain injuries from being shaken while in the care of a babysitter. An investigation by the Philadelphia Department of Human Services ("DHS") concluded that Tiffany Bennett and Oliver Bynum, Jr., the father of Iyonnah and Alexus, were "perpetrators by omission," and therefore Iyonnah was permanently placed with an adoptive family. Tiffany Bennett and Oliver Bynum, Jr. subsequently separated.

### B. Alexus and Aliyaha

---

[1] There are two related appeals in this case. One appeal is by the <u>Estate of Porchia Bennett</u> (06-2879), and the other is by <u>Alexus Bennett, Aliyaha Bennett, and Priscilla Bennett, by and through their Guardian Ad Litem Jonathan Irvine</u> (06-2978).

In 1997, DHS determined that Tiffany Bennett, a substance abuser who did not provide her children with necessary medical attention, posed a risk of serious harm to her children. Tiffany Bennett compounded this risk by actively avoiding contact with DHS. On May 30, 1997, DHS petitioned the family court to rule Alexus and Aliyaha dependent children because Tiffany Bennett was not cooperating with DHS in implementing a plan for their care. On June 4, 1997, the family court deferred adjudication of dependency but ordered DHS supervision of Alexus and Aliyaha. In December 1997, the family court learned Alexus was living in North Carolina with her father and ordered DHS to assess her situation. The North Carolina Department of Social Services visited Alexus in her new home and provided DHS with a positive report. The family court then discharged Alexus' dependency petition on February 19, 1998.

In July 1998, Aliyaha was temporarily committed to DHS and placed in foster care for two days because Tiffany Bennett was expelled from the shelter where they had been living. The family court returned Aliyaha to her mother and ordered Tiffany Bennett to enter another shelter, undergo a mental health evaluation, and cooperate with DHS. Tiffany Bennett and Aliyaha lived at the Salvation Army Shelter from August 1998 until May 1999. During that stay, Priscilla was born on January 12, 1999.

**C. The Bennetts Leave the Shelter**

On May 10, 1999, Tiffany Bennett left the Salvation Army Shelter with Priscilla and Aliyaha. Two days later, DHS social worker Yolanda Grant learned of Tiffany Bennett's unauthorized departure from the shelter. On June 1, 1999, Grant checked the Department of Public Administration's ("DPA") computer records and discovered that Tiffany Bennett's DPA benefits were still being sent to the Salvation Army Shelter. In an effort to locate Tiffany Bennett, Grant spoke with a DPA representative who confirmed that Bennett's benefits would be terminated on June 10, 1999, and that if Tiffany Bennett contacted DPA for benefit reinstatement she would be told she

4

must first contact DHS. However, when Tiffany Bennett sought benefit reinstatement, DPA allowed her to reinstate her benefits without contacting DHS. Grant made several other efforts to locate Tiffany Bennett, including: (1) contacting Priscilla's pediatrician; (2) visiting a former address at West Master Street; (3) speaking with Adiam Debesai, a social worker who had worked with Tiffany Bennett at the Salvation Army Shelter and who had spoken with Tiffany Bennett's mother, Dale Geiger; and (4) trying to contact Dale Geiger and Alexus' father by telephone.

On September 14, 1999, DHS petitioned family court to discharge DHS supervision and the dependency petition for Aliyaha. At the hearing, the Child Advocate[2] objected based on concern for Aliyaha's safety. Judge James Murray Lynn refused to terminate DHS' involvement and stated, "I don't want [this case] just sitting on a desk somewhere. I want to see work done. I want people to continue to look . . . . I want DHS to vigilantly look for the baby [Aliyaha]. When they get the baby, I want them to take the baby."

By early 1999, Alexus and her father had returned to Philadelphia, where Alexus attended public school. She lived with her paternal grandfather for a period of time, before returning to her mother's control.[3] In March 2003, Tiffany Bennett directed Alexus' school not to permit contact between Alexus and her grandfather.

**D. Bennett Case Reassigned & Discharged**

In November 1999, the Bennett DHS case was reassigned to social worker Iris Dejesus. On the case assignment sheet, social work supervisor Patricia Wilson wrote, "If you cannot

---

[2] A Child Advocate is member of the Child Advocacy Unit of the Defender Association of Philadelphia.

[3] The length of time Alexus lived primarily with her paternal grandfather is in dispute, but it is not material to the issue before us.

locate family by Nov. 14 [1999] request an early listing for discharge of this case, again, as floater SW [social worker] did. If you do locate family, J. Lynn made an order to take Aliyaha into DHS custody!!!" Dejesus did not try to locate the Bennetts until late March of 2000. On March 27, 2000, Dejesus sent search letters to the Department of Public Welfare and to the Office of Services to the Homeless and Adults. On April 17, 2000, Dejesus checked DPA's computer records and learned that Tiffany Bennett was receiving DPA benefits at a Grandsback Street address in Philadelphia. That same day, Dejesus visited the Grandsback Street address, but the house appeared abandoned.

On April 18, 2000, DHS again petitioned family court to discharge DHS supervision and Aliyaha's dependency petition because the "family is unable to be located." The child advocate did not object, and DHS supervision and the dependency petition were discharged by agreement.

### E. Porchia

In late 1999, Tiffany Bennett and her daughters began living periodically with Dale Geiger. Porchia was born on July 7, 2000. The Bennett sisters were exposed to unsuitable, unstable living conditions and to unfit care givers. For example, Jayson Chambers, a convicted child sex offender, was a babysitter for the Bennett sisters. Beginning in the fall of 2002, Tiffany Bennett paid Jerry Chambers, who suffered from a schizoaffective bipolar type disorder and a history of drug and alcohol abuse, fifty to eighty dollars per week to look after her children. With rare visits from their mother, the four Bennett sisters lived with Jerry Chambers and his girlfriend, Candace Geiger, who was Tiffany Bennett's younger sister.

Through its telephone hotline, DHS received a report at 7:25 p.m. on August 14, 2003 that Jerry Chambers beat the

6

Bennett sisters.[4]  The hotline report was classified as a General Protective Services report, which applies to allegations of neglect, and a DHS social worker was required to respond within twenty-four hours.  During the morning of August 15, 2003, DHS social worker Joe Maiden was assigned to investigate the hotline report.  Maiden reported that he visited the Bennett sisters' home twice on August 16, 2003, leaving a note at the first visit, and once on August 17, 2003, but he never got a response at the door.  The facts surrounding Maiden's response to the hotline report are disputed, but the parties agree that Maiden did not respond as he reported in his case progress notes.

On August 17, 2003 at approximately 1 p.m., emergency personnel rushed a brutally beaten Porchia to a hospital, where she was pronounced dead shortly after arrival. Alexus described the events leading to Porchia's death as follows.

> SHE STATED THAT ON SATURDAY PORTIA [sic] GOT A BEATING FROM JERRY WITH AN EXTENSION CORD.  SHE STATED THAT PORTIA'S [sic] WOUNDS WERE SO SEVERE THAT SHE COULD NOT LAY DOWN AND GO TO SLEEP.  JERRY BEAT HER AGAIN FOR MAKING NOISE.  HE PICKED HER UP AND SLAMMED HER TO THE FLOOR IN THE

---

[4]  The DHS Report Referral Data Narrative, which refers to Chambers as "Smokie," reads:

> RFRL REPORTER ALLEGED THAT "SMOKIE" (FAT) BEATS THE CHILDREN LIKE THEY ARE MEN. ACCORDING TO THE REPORTER FAT HANDS ARE SWOLLEN FROM BEATING ON THE CHILDREN. FAT MAKES THE GIRLS STAY IN THE HOUSE ALL THE TIME.  REPORTER STATED THAT RECENTLY SHE SAW THE OLDEST GIRL COME TO THE DOOR AND SHE HAD A SWOLLEN EYE. HOWEVER, REPORTER HAS NEVER SEEN OR HEARD THE CHILDREN BEING BEAT.

CORNER.  HE TOLD HER TO STAND UP IN
THE CORNER ALL NIGHT BUT THE SLAM
TO THE FLOOR HAD INJURED HER LEG
AND SHE COULD NOT STAND UP.  HE THEN
CHOKED AND KICKED HER.  SHE STATED
THAT THEY ALL WENT TO SLEEP AND IN
THE MORNING THEY FOUND PORTIS [sic]
WEDGED BETWEEN THE MATTRESS AND
THE RADIATOR.  "WE COULD NOT WAKE
HER."

Porchia's cause of death was listed as multiple blunt trauma, asphyxia and inanition.[5]  Porchia's autopsy revealed malnourishment, laceration of the liver, "[m]ultiple blunt force injuries to the head, chest, abdomen, back and extremities," and "[m]ultiple scars and healing injuries of varying ages from past episodes of blunt force injuries to head, trunk and extremities." Alexus, Aliyaha and Priscilla were admitted to the Children's Hospital of Philadelphia ("CHOP"), and they were given admission and discharge diagnoses of child abuse.  Alexus had facial injuries, a fractured eye socket, bruised and swollen eyes, scabbed-over back lesions, and scars on her buttocks.  Aliyaha and Priscilla also had scars, lesions, and bruises.

## F.  The Aftermath from the Bennett Sisters' Tragedy

In relation to Porchia's death, Jerry Chambers was convicted of first-degree murder and sentenced to death and seventy-three to one hundred forty-six years in prison.  Candace Geiger was convicted of third-degree murder and sentenced to seventeen to thirty-four years in prison.  Tiffany Bennett was

---

[5]  Inanition "covers not getting enough food; or in very stressed infants, even if they get enough food and they are forced to digest it, they just don't derive any nourishment from it.  It's a peculiar condition, well recognized in neglected and abused infants and children."  Young children "have to receive emotional support and feel safe; and when they don't, you tend to see this phenomena of wasting away.  We call that inanition, for want of a better term."

8

convicted of conspiracy and endangering the welfare of her children, and she was sentenced to twenty to forty years in prison.

A DHS Employee Violation Report was filed on Maiden for his activities related to the Bennett hotline report. The report stated that Maiden was being disciplined for failing to make reasonable efforts to access the Bennetts' home, for failing to notify his supervisors that he did not make the required home visit within twenty-four hours, and for making false and misleading representations regarding his response to the hotline report. Maiden resigned before DHS could proceed with its disciplinary process. Since August 2003, Alexus, Aliyaha and Priscilla have required a variety of mental health services, and they remain severely traumatized.

## II.

As we stated in note 1, two actions were filed following Porchia's death, and the appeals in both cases were argued together. Three Bennett sisters, Alexus, Aliyaha and Priscilla, through their guardian ad litem, sued the City of Philadelphia, DHS and its Director, and social workers Dejesus, Grant, and Wilson. They assert a claim under 42 U.S.C. § 1983 for violation of their due process right to bodily integrity from harm inflicted by private parties under the state-created danger doctrine.

The Estate of Porchia Bennett also filed a suit against the City and Maiden under 42 U.S.C. § 1983, asserting in addition conspiracy, wrongful death and survival action claims. The District Court ordered that the Estate's case and the Bennett sisters' case be tried simultaneously, but granted the defendants' motion for summary judgment before trial.[6] Plaintiffs in both

---

[6] The District Court also granted summary judgment in the City's favor as to the Estate's: (1) § 1983 conspiracy claim on the grounds that its "vague and unsubstantiated allegations fail[ed] to create a genuine issue of material fact that a conspiracy existed[,]"

9

cases appeal.[7]

The "state-created danger" doctrine emanates from language in <u>DeShaney v. Winnebago County Department of Social Services</u>, 489 U.S. 189 (1989), a case where the United States Supreme Court confronted a factual scenario markedly similar to that presented here. There, the county Department of Social Services ("DSS") and several of its social workers received complaints that a child, Joshua, was being abused by his father. The caseworker assigned to Joshua recorded her observations in her files, along with her continuing suspicions that someone in the DeShaney household was physically abusing Joshua, but she did nothing more. <u>Id.</u> at 193. The caseworker was later notified that Joshua had been treated again for injuries that appeared to have been the result of child abuse. She made two visits to the DeShaney household, but was informed that Joshua was too ill to see her and the department again took no action. <u>Id.</u> Joshua was eventually beaten so badly that he suffered permanent brain damage and was rendered profoundly retarded. <u>Id.</u>

Joshua and his mother brought an action under 42 U.S.C. § 1983 against the county, DSS, and various individual employees of the department. "The complaint alleged that respondents had deprived Joshua of his liberty without due process of law, in violation of his rights under the Fourteenth Amendment, by failing to intervene to protect him against a risk of violence at his father's hands of which they knew or should have known." <u>Id.</u> The district court granted summary judgment

App. at 40; and (2) wrongful death and survival act claims against the City and Maiden on the ground that they are immune from tort liability pursuant to Pennsylvania's Political Subdivision Tort Claims Act, 42 Pa. Cons. Stat. § 8541 et seq. We do not consider these rulings in this appeal because they have not been raised in the Appellants' brief. <u>See</u> <u>Couden v. Duffy</u>, 446 F.3d 483, 492 (3d Cir. 2006).

[7] The District Court had jurisdiction under 28 U.S.C. § 1331. This court has jurisdiction under 28 U.S.C. § 1291.

for defendants, and the Court of Appeals affirmed, holding that petitioners had failed to state an actionable § 1983 claim.  The United States Supreme Court granted certiorari to remedy inconsistent approaches taken by appellate courts in determining when, if ever, the failure of a local governmental entity or its agents to provide an individual with adequate protective services constitutes a violation of the individual's due process rights.  Id. at 194.

The Court explained that because the harms that Joshua suffered did not occur while he was in the State's custody, but occurred while he was in the custody of his natural father, who was not a state actor, his claim could not succeed.  Id. at 201.  The Court concluded that:

> While the State may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them.  That the State once took temporary custody of Joshua does not alter the analysis, for when it returned him to his father's custody, it placed him in no worse position than that in which he would have been had it not acted at all; the State does not become the permanent guarantor of an individual's safety by having once offered him shelter.  Under these circumstances, the State had no constitutional duty to protect Joshua.

Id. (emphasis added).

Justice Blackmun began the last paragraph of his dissent with the now memorable words, "Poor Joshua!"  He continued,

> Victim of repeated attacks by an irresponsible, bullying, cowardly, and intemperate father, and abandoned by respondents who placed him in a dangerous predicament and who knew or learned what was going on, and yet did essentially nothing except, as the Court revealingly observes, *ante*, at

11

193, "dutifully recorded these incidents in [their] files."  It is a sad commentary upon American life, and constitutional principles – so full of late of patriotic fervor and proud proclamations about "liberty and justice for all" – that this child, Joshua DeShaney, now is assigned to live out the remainder of his life profoundly retarded.  Joshua and his mother, as petitioners here, deserve – but now are denied by this Court – the opportunity to have the facts of their case considered in the light of the constitutional protection that 42 U.S.C. § 1983 is meant to provide.

Id. at 213 (Blackmun, J., dissenting).

Notwithstanding the views of the dissenting Justices (Brennan and Marshall, in addition to Blackmun), the state-created danger doctrine has become a staple of our constitutional law.  As this court recently held, to establish a claim based on the state-created danger doctrine, a plaintiff must satisfy the following elements: (1) the harm caused was foreseeable and fairly direct; (2) a state actor acted with a degree of culpability that shocks the conscience; (3) some relationship existed between the state and the plaintiff that renders plaintiff a foreseeable victim; and (4) "a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all."  Bright v. Westmoreland County, 443 F.3d 276, 281 (3d Cir. 2006).

This court has consistently adhered to the Supreme Court's pronouncements in DeShaney.  For example, in Kaucher v. County of Bucks, 455 F.3d 418 (3d Cir. 2006), this court stated that petitioners must allege affirmative acts that were the "but for cause" of the risks they faced, id. at 433 n.10, and noted that we have held that failures to act cannot form the basis of a valid § 1983 claim.  See id. at 433 n.10 (citing Bright, 443 F.3d at 283-84 (failure to hold revocation hearing for an individual in violation of his parole prior to killing an eight-year-old girl); Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 907-08 (3d

12

Cir. 1997) (failure to prevent mentally disturbed individual from entering school and attacking teacher); <u>D.R. v. Middle Bucks Area Vocational Tech. Sch.</u>, 972 F.2d 1364, 1376 (3d Cir. 1992) (failure of school officials to investigate and stop instances of sexual abuse of students) (en banc); <u>Brown v. Grabowski</u>, 922 F.2d 1097 (3d Cir. 1990) (failure to file criminal charges against an individual who repeatedly threatened and assaulted former girlfriend, despite reports to the police by the victim and her family)).

In <u>Bright</u>, this court relied on <u>DeShaney</u> in rejecting appellant's claim that a police officer's knowledge of a danger to the victim creates an affirmative duty to protect the victim from that harm. Rather, we explained that <u>DeShaney</u> clearly holds that "no affirmative duty to protect arises from the State's knowledge of the individual's predicament." <u>Bright</u>, 443 F.3d at 284 (internal citation and quotation marks omitted). "Liability requires affirmative state action; mere 'failure to protect an individual against private violence' does not violate the Due Process Clause." <u>Id.</u> (quoting <u>DeShaney</u>, 489 U.S. at 197).

In granting summary judgment to the defendants, the District Court concluded that Plaintiffs in both cases had failed to meet their burden of establishing a genuine issue of material fact with regard to the fourth element of their state-created danger claims – that a state actor affirmatively used his or her authority to render the citizen more vulnerable to danger than had the state not acted at all.

In <u>Kneipp v. Tedder</u>, 95 F.3d 1199 (3d Cir. 1996), the one case that has often been cited as deviating from the court's otherwise unbroken series of holdings following the state-created danger doctrine, we expressly stated that "we adopt the 'state-created danger' theory as a viable mechanism for establishing a constitutional violation under 42 U.S.C. § 1983." <u>Id.</u> at 1201. The Kneipps, who were returning on foot from a night of drinking at a neighborhood tavern, were stopped by the police on the highway for causing a disturbance. They were one-third of a block from their home. Mr. Kneipp requested and was given permission by the police to go home to relieve the

13

babysitter. He assumed that because Mrs. Kneipp was inebriated, the police would take her either to the hospital or to the police station, and therefore he proceeded home without her. Instead, the police officer sent her on her way alone; she never reached home, but instead ended up unconscious at the bottom of an embankment next to a parking lot across the street from her home. As a result of her exposure to the cold, she suffered permanent brain damage impairing many basic body functions.

This court did not rely on the state-created danger doctrine to affirm the district court's grant of summary judgment to the City defendants. Instead, we reversed, holding that there was sufficient evidence in the record to show that the police officers used their authority to create a dangerous situation or to make Mrs. Kneipp more vulnerable to harm than had they not intervened. The court explained,

> It is conceivable that, but for the intervention of the police, [Mr. Kneipp] would have continued to escort his wife back to their apartment where she would have been safe. A jury could find that [Mrs. Kneipp] <u>was in a worse position after the police intervened than she would have been if they had not done so</u>.

Id. at 1209 (emphasis added).

The Bennett sisters contend that the closing of their dependency case rendered them more vulnerable to harm by their mother and acquaintances because closing the case effectively prevented a private source of aid, the Child Advocate, from looking for the children. They argue that the District Court erred in concluding "that DHS' misrepresentation and the subsequent discharge of supervision and Aliyaha's dependency [petition] did not violate the Bennett sisters' substantive due process rights by making them more vulnerable to danger from inappropriate care givers than if DHS had not acted at all." Appellants' Br. at 24-25 (quoting Dist. Ct. Op. at 16).

The District Court's conclusion that DHS' case closure

14

did not prevent the Child Advocacy Unit from searching for the children is supported by the record. It remained free to search for the Bennett children even after the case was closed. We must agree with the District Court that Appellants failed to demonstrate a material issue of fact that the City used its authority to create an opportunity for the Bennett sisters to be abused that would not have existed absent DHS intervention.

The Estate makes a slightly different argument. It contends that because Maiden asked his superiors at DHS to assign the Bennett case to him, although it was destined for another social worker, he was responsible for the type of affirmative act for which the City should be held responsible. It is undisputed that after he was assigned the case Maiden did not perform the duties vis-à-vis Porchia that were incumbent upon a dedicated social worker. Although we believe Maiden's actions (or more accurately, inactions) were beyond the pale, we conclude that in essence the Estate's argument is no more than another effort to circumvent the state-created danger doctrine. We are not free to do that.

The District Court did not err in concluding that the City did not take action in the constitutional sense. Maiden's actions did not result in the creation of dangers by the state, but rather those dangers already existed. Maiden was therefore not the "but for" cause of the harm to Porchia Bennett in this case.

### III.

We return to the point made at the beginning of this opinion. If a municipality, state or other public body is to be liable under the Constitution for harm caused by private parties to persons not in custody, the liability would be unlimited. There is no legal doctrine that supports imposition of such liability. Without legislative activity, we are not prepared to hold that a city that fails to respond promptly to a 911 call must pay for the harm that befalls the caller as a result of the failure. The fact is that most 911 calls are answered, that the police use their best efforts in many cases, and that they prevent egregious harm. We have less personal experience with DHS but are

15

willing to assume, for this purpose, that this is also true of DHS social workers, notwithstanding the well-publicized cases of failures in that connection.

However, it is not the role of the courts, certainly not the federal courts, to rectify the failures that do happen. That is the responsibility of the citizens of the body politic, who elect the leaders of the executive branch of the respective city, state or municipality. If the public raises its voice and demands accountability, and is willing to use the ballot to support those demands, then change and improvement can and will occur. Unfortunately, it will be too late for Porchia Bennett.

**IV.**

For the reasons set forth above, we will affirm the judgment of the District Court.

16