**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 24-1863
_____

NEAL MILLER; DONNA MILLER, Individually and as
Administrators of the Estate of Ryan Miller, a Minor, Deceased,

Appellants

v.

JOSEPH WOLK, Individually and in his Official Capacity;
GARY BOVE

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2:20-cv-06301)
District Judge: Honorable Michael M. Baylson

_____

Submitted under Third Circuit L.A.R. 34.1(a)
on May 22, 2025

Before: PHIPPS, CHUNG and ROTH, *Circuit Judges*

(Opinion filed: June 3, 2026)

_____

OPINION*
_____

---

* This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not
constitute binding precedent.

ROTH, *Circuit Judge*

Fifteen-year-old Ryan Miller borrowed his neighbor's motor-scooter and rode it on the streets of Philadelphia without a helmet or license plate. Joseph Wolk, a seasoned police officer, decided that these minor infractions justified a high-speed chase through a dense, residential neighborhood, in contravention of numerous applicable police regulations. As a consequence of Wolk's decision, Ryan is now dead.[1] Although the circumstances of his death trouble us, the narrow question before us on appeal is not whether Wolk's conduct was prudent, just, or good police work, but whether Ryan's parents have adequately shown that Wolk violated Ryan's clearly established constitutional rights. Because the record fails to demonstrate that Wolk intended to harm Ryan, we will affirm the District Court's order granting summary judgment to Wolk.

## I.[2]

On May 7, 2019, Wolk was patrolling in Philadelphia when he saw Ryan driving a motor-scooter without license plates or a helmet, both of which constituted summary traffic offenses under Pennsylvania law.[3] Wolk activated his lights and sirens and began to follow Ryan, but Ryan sped up and turned onto a four-lane thoroughfare. Wolk followed in pursuit.

---

[1] To distinguish Ryan from his parents, the plaintiffs in this action, we refer to him by his first name.

[2] Because we write for the parties, we recite only those facts relevant to our disposition. Because this appeal comes to us on a motion for summary judgment, we review those facts in the light most favorable to the Millers, the non-moving party. *See Rivera v. Redfern*, 98 F.4th 419, 422 (3d Cir. 2024).

[3] *See* 75 Pa.C.S. §§ 1332, 3525.

In doing so, Wolk violated several Philadelphia Police Department policies. Neither the license plate nor helmet infractions were permissible grounds for a vehicular pursuit, and Wolk never informed his superiors about the chase or called for backup.[4] Also, before turning into the residential neighborhood, Wolk deactivated his lights and sirens, which would remain deactivated for the remainder of the chase.

During the chase, Gary Bove, a civilian tow truck driver with whom Wolk was familiar, took it upon himself to join the chase and pursue Ryan. Bove pursued Ryan—out of Wolk's line of sight—until Ryan drove through a red light at a busy intersection and fatally collided with a tractor-trailer. Slightly more than two minutes had elapsed between Wolk's initial pursuit and Ryan's fatal crash. Immediately after the accident, Wolk notified his supervisors about the car chase. Yet in his accident report, Wolk omitted any mention of Bove's participation.

Neal and Donna Miller, Ryan's parents, subsequently filed suit on December 15, 2020. The Millers allege that Wolk is liable under 42 U.S.C. § 1983 for violating Ryan's substantive due process rights under the Fourteenth Amendment.[5] On March 12, 2024, the District Court granted summary judgment in favor of Wolk. The Millers appealed.

---

[4] *See* Philadelphia Police Department Directive 9.4, § 1-B (Dec. 31, 2008) ("Dir. 9.4").

[5] The complaint also alleged a negligence claim against Bove, as well as procedural due process and unlawful seizure claims against Wolk. Those claims were previously dismissed; none of them are raised in this appeal and are thus forfeited. *See In re Wettach*, 811 F.3d 99, 115 (2016) (holding that arguments not developed in opening brief were forfeited).

## II.[6]

We review the granting of summary judgement de novo.[7]  We may affirm only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[8]  Here, the alleged victim was killed and the only witness to part of the encounter was the alleged perpetrator.  As a consequence, the court must "also look at the circumstantial evidence that, if believed, would tend to discredit the [defendant's] story, and consider whether this evidence could convince a rational fact finder that" the defendant is liable.[9]  Nevertheless, "a party opposing summary judgment must present *affirmative* evidence—whether direct or circumstantial—to defeat summary judgment, and may not rely simply on the assertion that a reasonable jury could discredit the opponent's account."[10]

## III.

"As a general principle, the government has no obligation under the Due Process Clause of the Fourteenth Amendment to protect citizens against injuries caused by private actors."[11]  However, in certain egregious circumstances, someone, who was injured by a

---

[6] The District Court had jurisdiction under 28 U.S.C. § 1331.  We have jurisdiction under 28 U.S.C. § 1291.

[7] *Qin v. Vertex Inc.*, 100 F.4th 458, 469 (3d Cir. 2024).

[8] Fed. R. Civ. P. 56(a).

[9] *Lamont v. New Jersey*, 637 F.3d 177, 182 (3d Cir. 2011) (quoting *Abraham v. Raso*, 183 F.3d 279, 294 (3d Cir. 1999)).

[10] *Est. of Smith v. Marasco*, 318 F.3d 497, 514 (3d Cir. 2003) (citing *Williams v. Borough of W. Chester*, 891 F.2d 458, 460–61 (3d Cir. 1989)).

[11] *Haberle v. Troxell*, 885 F.3d 170, 176 (3d Cir. 2018) (citation omitted).

danger that the government actively exacerbated, may be the victim of a constitutional violation capable of supporting a § 1983 action.[12]

To succeed under this "state-created-danger doctrine," the Millers must demonstrate, *inter alia*, that Wolk, as a state actor, acted with a degree of culpability that "shocks the conscience."[13]

## A.

Generally, "[t]his culpability standard turns on timing—the less time an officer has to act, the less blameworthy a flawed decision is."[14]

Our Circuit has recognized three categories of potential culpability:

1) If the situation was "hyper[-]pressurized," requiring "split-second decisions," the officer is not liable unless he intended to harm.
2) If the situation gave the officer hours or minutes to engage in "hurried deliberation," the officer is not liable unless he "consciously disregarded . . . a great risk of serious harm."
3) If the situation was "unhurried" and left time for "careful deliberation," the officer can be liable if he was "deliberately indifferent to the risk of harm."[15]

In applying this framework to police chases, three prior opinions light our way. First, in *County of Sacramento v. Lewis*,[16] the Supreme Court applied the intent-to-harm standard to officers who engaged in a 75-second high-speed chase with a dangerously

---

[12] *See Kneipp v. Tedder*, 95 F.3d 1199, 1205 (3d Cir. 1996) (adopting the state-created-danger doctrine); *Haberle*, 885 F.3d at 177 (noting that the doctrine is reserved for "only the most egregious official conduct" and not mere negligence (citation omitted)).
[13] *Bright v. Westmoreland Cnty.*, 443 F.3d 276, 281 (3d Cir. 2006).
[14] *Otero v. Kane*, 161 F.4th 189, 192 (3d Cir. 2025).
[15] *Id.*
[16] 523 U.S. 833 (1998).

fleeing motorcyclist (who ultimately lost control of his vehicle and crashed).[17] The Court noted that police are often required to make decisions "in haste, under pressure, and frequently without the luxury of a second chance."[18] The Court found that "when unforeseen circumstances demand an officer's instant judgment," a greater level of culpability is required.[19] Applying these principles to the facts before it, the Court observed that the officers had not caused the suspect's dangerous, lawless driving, and that once the chase was on, the officer had done "nothing (beyond a refusal to call off the chase) to encourage" the offender to continue his escape.[20]

Similarly, in *Davis v. Township of Hillside*, we applied the intent-to-harm test to a police officer who fatally crashed into a bystander after he violated police department regulations, initiated a high-speed chase through a residential neighborhood, and intentionally rammed the plaintiff's car.[21] In that case, we explained that to meet the intent-to-harm test, a plaintiff must show that the officer's "conduct intended to injure in some way *unjustifiable by any government interest*."[22] Although the chase in question violated police department regulations and the officer had intentionally rammed the plaintiff's car, we held that "*Lewis* does not permit an inference of intent to harm simply because a chase eventuates in deliberate physical contact causing injury."[23]

---

[17] *Id*. at 853–54.
[18] *Id*. at 852 (quotation omitted).
[19] *Id.* at 853.
[20] *Id*. at 855.
[21] 190 F.3d 167, 169 (3d Cir. 1999).
[22] *Id.* at 171 (quoting *Lewis*, 523 U.S. at 849).
[23] *Id*.

6

Finally, in *Sauers v. Borough of Nesquehoning*, we applied the middle-ground, "hurried deliberation" standard to an officer who lost control of his vehicle when traveling at speeds of over 100 miles per hour and crashed into a car, severely injuring one occupant and killing his wife.[24] In that case, we highlighted two material factual differences which distinguished *Sauers* from *Lewis* and *Davis*. First, unlike in *Lewis* and *Davis*, the officer in *Sauers* "had at least some time to deliberate" because he had time to call—and actually spoke with—the neighboring police department.[25] Second, there was "no emergency arising from a simple traffic violation" because *Sauers* involved at most a summary traffic offense and thus, there was no emergent public safety risk from waiting for others to respond.[26]

**B.**

The first task in our analysis requires us to determine which culpability standard applies to the facts at-hand. The Millers urge us to treat Wolk like the officer in *Sauers* and apply a "conscious disregard" culpability standard, whereas Wolk contends that the "intent to harm" standard applies. We agree with Wolk that this case is more akin to *Lewis* and *Davis* than to *Sauers*, and that "intent to harm" is the correct culpability standard.

We recently clarified that the relevant timeframe for culpability "starts running the clock when, in the totality of the circumstances, an event occurs that requires officers to

---

[24] 905 F.3d 711, 717–18 (3d Cir. 2018).
[25] *Id*. at 718 (finding that the officer was, nevertheless, entitled to qualified immunity because the right at question had not been clearly established).
[26] *See id*.

decide whether to pursue a suspect *dangerously*."[27]  Accordingly, the timeline relevant to our analysis does not begin when Wolk initiated his pursuit of Ryan for the license plate and helmet violations, but rather when Ryan decided to speed away from Wolk, leaving the officer to make an "instantaneous" decision to either give up or give chase.[28]  In cases like this one, where an officer engages in a high-speed pursuit arising from "split-second decisions to pursue fleeing suspects," we will continue to abide by the "longstanding principle" that "constitutional liability cannot exist absent an intent to harm."[29]

The Millers emphasize that, during the two minutes in which Wolk's pursuit was ongoing, he had time to make numerous decisions—exemplified by his repeated attempts to forcibly stop Ryan's motor scooter—and adjust his strategy for catching Ryan.  But officers in the middle of a high-speed chase suffer not from a lack of decision-points, but from a deluge of them, cascading too quickly for cold, detached reason.  It is undisputed that, throughout the entire duration of his chase, Wolk remained within a rapidly developing environment.  Because Wolk never had an opportunity to make "hurried deliberations," we will apply the "intent to harm" culpability standard.

## C.

Where the intent-to-harm standard applies, plaintiffs may only recover if they can show that the defendant had the subjective intention to inflict harm for reasons unrelated

---

[27] *Otero*, 161 F.4th at 193.
[28] *Davis*, 190 F.3d at 171.
[29] *Sauers*, 905 F.3d at 723.

8

to any legitimate governmental interest.[30]  Based on the record before us, Wolk cannot be liable because there is no evidence that he intended to harm Ryan.

In short, the Millers' evidence is insufficient to show that Wolk also acted with an intent to harm.  Because such an intent was an essential element of the Millers' claim,[31] the District Court properly granted summary judgment to Wolk.

## IV.

The authority society grants police to conduct high-speed, high-risk chases carries an implicit trust that such authority will only be used where truly warranted.[32]  It could be questioned whether that trust was misplaced here.  But in our limited role as appellate judges, constrained by both circuit and Supreme Court precedent addressing the limited question of law with which we are presented, we agree that the Millers have not shown a cognizable basis for recovery.  The District Court's order will be affirmed.[33]

---

[30] *See Davis*, 190 F.3d at 171.

[31] *See Lewis*, 523 U.S. at 854 (holding that "high-speed chases with no intent to harm suspects physically or to worsen their legal plight do not give rise to liability under the Fourteenth Amendment, redressable by an action under § 1983.").

[32] *Cf. Sauers*, 905 F.3d at 718 (noting that because "[e]very police officer understands" the risk of high-speed chases, "we expect our law enforcement personnel to engage in such pursuits only when it is truly necessary).

[33] Because we hold that no reasonable jury could return a verdict that Wolk intended to harm Ryan, we need not address the Millers' arguments concerning the proximate cause of his death.

9

PHIPPS, *Circuit Judge*, concurring in the judgment.

This case involves a claim under 42 U.S.C. § 1983 for a deprivation of a liberty interest protected by the Due Process Clause of the Fourteenth Amendment based on a state-created danger. Thirty years ago, this Court in *Kneipp v. Tedder*, 95 F.3d 1199 (3d Cir. 1996), concluded that substantive due process requires state actors to protect individuals from dangers that they create, and it announced a four-element test for a state-created-danger claim. *Id.* at 1204–06, 1208, 1211. Around that same time, other federal appellate courts, but not all, also embraced varying formulations of a state-created-danger doctrine.[1]

The Supreme Court, however, has never endorsed, much less recognized, the doctrine. To the contrary, one year after *Kneipp*, the Supreme Court in *Washington v. Glucksberg*, 521 U.S. 702 (1997), articulated a more stringent test for the recognition of liberty interests protected by due process than was in effect when *Kneipp* was decided. Under that two-part test, a protected liberty interest must be "'implicit in the concept of ordered liberty,' such that 'neither liberty nor justice would exist if they were sacrificed,'" and it must be "deeply rooted in this Nation's history and tradition." *Id.* at 720–21 (first quoting *Palko v. Connecticut*, 302 U.S. 319, 325, 326 (1937); and then quoting *Moore v. City of East Cleveland*, 431 U.S. 494, 503 (1977) (plurality opinion)). That test remains controlling. *See Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 231 (2022) ("[T]he Due Process Clause of the Fourteenth Amendment . . . has been held to guarantee some rights that are not mentioned in the Constitution, but any such right must be 'deeply rooted

---

[1] *E.g.*, *Dwares v. City of New York*, 985 F.2d 94, 98–99 (2d Cir. 1993), *overruled on other grounds by Leatherman v. Tarrant Cnty. Narcotics Intel. & Coordination Unit*, 507 U.S. 163 (1993); *Davis v. Brady*, 143 F.3d 1021, 1025–27 (6th Cir. 1998); *Freeman v. Ferguson*, 911 F.2d 52, 54–55 (8th Cir. 1990); *L.W. v. Grubbs*, 974 F.2d 119, 121 (9th Cir. 1992); *Uhlrig v. Harder*, 64 F.3d 567, 572–75 (10th Cir. 1995). *But see Fisher v. Moore*, 73 F.4th 367, 375 (5th Cir. 2023) ("Our precedent has repeatedly declined to adopt the state-created danger doctrine.").

in this Nation's history and tradition' and 'implicit in the concept of ordered liberty.'" (quoting *Glucksberg*, 521 U.S. at 721)).

Nonetheless, this Court has never reevaluated its state-created-danger doctrine in light of *Glucksberg*. Instead, this Court has gone in the other direction. In contravention of the Supreme Court's "reluctan[ce] to expand the concept of substantive due process," *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992), this Court has broadened the reach of the state-created-danger doctrine to extend to any "member of a discrete class of persons subjected to the potential harm brought about by the state's actions," *Bright v. Westmoreland County (Bright II)*, 443 F.3d 276, 281 (3d Cir. 2006) (quoting *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 913 (3d Cir. 1997)), and has recently articulated "three categories of potential culpability" that the Majority Opinion analyzes today. Maj. Op. 5. The doctrine, however, is invalid in its entirety if it cannot satisfy the *Glucksberg* standard, and I believe that it cannot.

Even if the state-created-danger doctrine could survive the *Glucksberg* test, it should not be expanded further as the Majority Opinion does today. Specifically, despite ultimately denying the state-created danger claim, the Majority Opinion formulates the doctrine to apply to injuries resulting from independently created dangers – not those created by state actors. *Id.* at 3, 8. That is a problem.

For these reasons, elaborated below, I concur only in the judgment.

**A. The State-Created-Danger Doctrine Does Not Satisfy the *Glucksberg* Standard.**

The state-created-danger doctrine cannot meet either prong of the *Glucksberg* test and is therefore invalid.

First, a liberty interest in being free from state-created danger is not "'implicit in the concept of ordered liberty,' such that 'neither liberty nor justice would exist if they were

sacrificed.'" *Glucksberg*, 521 U.S. at 721 (quoting *Palko*, 302 U.S. at 325, 326).  The absence of substantive-due-process protections for state-created dangers would not collapse liberty or justice in America because other remedies for injuries sustained from state-created dangers are potentially available.  *See Palko*, 302 U.S. at 325 (holding that the Fourteenth Amendment incorporates rights without which "a fair and enlightened system of justice would be impossible").  It is true that Pennsylvania affords immunity from tort claims to many actions taken by state and municipal employees, including police officers.  *See, e.g.*, 1 Pa. Cons. Stat. § 2310; 42 Pa. Cons. Stat. §§ 8521, 8541; *see also Downey v. Pa. Dep't of Corr.*, 968 F.3d 299, 310 (3d Cir. 2020).  But the presence of those state laws does not compel the recognition of a constitutionally protected liberty interest.  Pennsylvania and other states with similar protections could rescind those immunities and permit tort suits against state and municipal employees.  *See, e.g.*, 42 Pa. Cons. Stat. § 8522 (waiving immunity for negligence claims in ten instances including the operation of a motor vehicle).  Congress could also attempt to induce reform in this area, possibly by conditioning federal funding upon the availability of meaningful redress under state law or upon a waiver or rescission of applicable immunities.  *See M.A. ex rel. E.S. v. State-Operated Sch. Dist. of City of Newark*, 344 F.3d 335, 346 (3d Cir. 2003) (recognizing that Congress could condition federal funds on a state's waiver of its sovereign immunity).  Or if the problem were particularly egregious or widespread, Congress or the Commonwealth could establish a common fund to compensate victims of state-created dangers.  *Cf., e.g.*, 34 U.S.C. § 20101 (providing a federal common fund for crime victims); 18 Pa. Cons. Stat. § 11.1101(b)(3) (establishing the Crime Victim Services and Compensation Fund); September 11th Victim Compensation Fund of 2001, Pub. L. No. 107-42, 115 Stat. 237, 237–41 (2001).  The old-school remedy of a private bill remains an option as well despite

3

its limited success in the modern era.  *See generally* Jeffrey S. Hill & Kenneth C. Williams, *The Decline of Private Bills: Resource Allocation, Credit Claiming, and the Decision to Delegate*, 37 Am. J. Pol. Sci. 1008, 1010 (1993) (explaining that "[h]istorically, private bills have regularly made up a large part of the legislative work load," and that "only within recent history has Congress shown a willingness to eliminate its responsibility for private claims legislation").  With the availability of these other potential remedial mechanisms, a constitutionally recognized liberty interest in being free from state-created dangers is not "implicit in the concept of ordered liberty."  *Glucksberg*, 521 U.S. at 721 (quoting *Palko*, 302 U.S. at 325).

Second, a liberty interest in being free from state-created danger is not "deeply rooted in this Nation's history and tradition."  *Id.* (quoting *Moore*, 431 U.S. at 503).  That history-and-tradition test looks for the enduring presence of the liberty interest in the English common law and in American legal history both before and after the Constitution's ratification.  *See Dobbs*, 597 U.S. at 239 (pointing out that the *Glucksberg* decision "surveyed more than 700 years of 'Anglo-American common law tradition'" (quoting *Glucksberg*, 521 U.S. at 711)).  But the historical antecedents for a liberty interest in being free from a state-created danger do not run particularly deep.  *See Murguia v. Langdon*, 73 F.4th 1103, 1107–08 (9th Cir. 2023) (Bumatay, J., dissenting from denial of rehearing en banc) ("[F]or over a century after the ratification of the Fourteenth Amendment, no court had recognized a substantive due process right against injury from private actors under a 'state-created danger' exception.").

Some of the earliest footing for such a liberty interest comes from the Restatement (First) of Torts in 1934.  Section 321 of that restatement recognized a duty with respect to

4

dangers that arose from independently changed circumstances or that were appreciated only upon learning additional information:

> If the actor does an act, which at the time he has no reason to believe will involve an unreasonable risk of causing bodily harm to another, but which, because of a change of circumstances or fuller knowledge acquired by the actor, he subsequently realizes or should realize as involving such a risk, the actor is under a duty to use reasonable care to prevent the risk from taking effect.

Restatement (First) of Torts § 321 (A.L.I. 1934). But the state-created-danger doctrine does not depend on independently changed circumstances or newfound knowledge. It involves the affirmative use of authority by a state actor to "create[] a danger" or to render a person "more vulnerable to danger than had the state not acted at all" in a way that "shocks the conscience." *Bright II*, 443 F.3d at 281.

More in line with created-danger principles, in 1965, the Restatement (Second) of Torts expanded § 321 to extend the duty to acts that create unreasonable risks of physical harm:

> If [an] actor does an act, and subsequently realizes *or should realize* that it has created an unreasonable risk of causing physical harm to another, he is under a duty to exercise reasonable care to prevent the risk from taking effect.

Restatement (Second) of Torts § 321(1) (A.L.I. 1965) (emphasis added). When applied to state actors, that articulation captures much of the gist of the state-created-danger doctrine (but not all of it, such as the requirement that the conduct of the state actor shock the conscience, *see Bright II*, 443 F.3d at 281). Even so, the Second Restatement announced this formulation in the mid-twentieth century – too late of a debut to be deeply rooted in history and tradition. *See Dobbs*, 597 U.S. at 241. More fundamentally, the Supreme Court has repeatedly rejected efforts to constitutionalize tort law,[2] so the presence of a duty under

---

[2] *See, e.g., Paul v. Davis*, 424 U.S. 693, 701 (1976) (holding that the Fourteenth Amendment's Due Process Clause does not "extend . . . a right to be free of injury wherever the State may be characterized as the tortfeasor"); *Daniels v. Williams*, 474 U.S. 327, 332

5

tort law is not enough of a foundation, by itself at least, from which to infer a constitutionally protected liberty interest. Accordingly, the state-created-danger doctrine also fails *Glucksberg*'s second prong.

Nor does anything in the origin story of the state-created-danger doctrine alter these conclusions. The doctrine was derived from *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189 (1989), which held that a state's failure to protect persons outside of its custody from private violence "does not constitute a violation of the Due Process Clause." *Id.* at 197. Because the facts of that case involved a young child previously in state custody, the Supreme Court considered whether that prior custodial period had any effect on the claimed due process right. *Id.* at 197–98. In concluding that the prior custody did not prompt post-custodial due process protections, the Supreme Court explained that the state did not "do anything to render [the child] any more vulnerable . . . for when it returned him to his father's custody, it placed him in no worse position than that in which he would have been had [the state] not acted at all." *Id.* at 201. From that passage, this Court in *Kneipp,* along with several other federal appellate courts,[3] recognized a substantive-due-process liberty interest in being free from state-created dangers, but that liberty interest is more expansive than anything contemplated in *DeShaney* – it exists regardless of any prior period of state custody. *Kneipp*, 95 F.3d at 1204–06, 1211. *But see*

___

(1986) (holding that the Fourteenth Amendment "does not purport to supplant traditional tort law in laying down rules of conduct to regulate liability for injuries"); *cf. Estelle v. Gamble*, 429 U.S. 97, 106 (1976) ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."); *Baker v. McCollan*, 443 U.S. 137, 146 (1979) ("[F]alse imprisonment does not become a violation of the Fourteenth Amendment merely because the defendant is a state official.").

[3] *See supra* note 1; *see also Irish v. Fowler*, 979 F.3d 65, 73–75 (1st Cir. 2020); *Doe v. Rosa*, 795 F.3d 429, 436–39 (4th Cir. 2015); *King ex rel. King v. E. St. Louis Sch. Dist. 189*, 496 F.3d 812, 817–18 (7th Cir. 2007); *Butera v. District of Columbia*, 235 F.3d 637, 651 (D.C. Cir. 2001).

*Est. of Romain v. City of Grosse Pointe Farms*, 935 F.3d 485, 494 (6th Cir. 2019) (Murphy, J., concurring) (opining that the state-created danger doctrine "runs counter to [*DeShaney*'s] general thrust—that the Due Process Clause is ill-suited for claims seeking state protection from private violence").

But even under that derivation, a liberty interest in being free from a state-created danger does not pass the *Glucksberg* test. For the first prong, even if inferences from *DeShaney* reasonably support state-created-danger principles, that does not mean that, for ordered liberty to exist, persons outside of state custody must have a constitutionally recognized right to be free from a state-created danger. As the Supreme Court explained in *DeShaney*, "the Due Process Clause of the Fourteenth Amendment . . . does not transform every tort committed by a state actor into a constitutional violation." 489 U.S. at 202. And, as set forth above, because there are numerous other potential mechanisms for remedying injuries from state-created dangers, the lack of such a liberty interest for persons outside of a state's custody does not pose an existential threat to liberty and justice in this Country. *See Glucksberg*, 521 U.S. at 721. Moreover, under the second *Glucksberg* prong, such a liberty interest is not deeply rooted in this Nation's history and tradition. Inferences from the *DeShaney* decision in 1989 are not deeply enough rooted to sustain the recognition of a constitutionally protected liberty interest in being free from a state-created danger. *See Dobbs*, 597 U.S. at 241.

Concerns about the origin of the state-created-danger doctrine have prompted three judges on this Court to call for revisiting it through *en banc* reconsideration.[4] That makes

---

[4] *See Johnson v. City of Philadelphia*, 975 F.3d 394, 404 (3d Cir. 2020) (Matey, J., concurring) ("[O]ur full Court should revisit the state-created danger doctrine."); *id.* at 405 (Porter, J., concurring) ("[O]ur full Court should revisit the state-created danger doctrine."); *Kedra v. Schroeter*, 876 F.3d 424, 462 (3d Cir. 2017) (Fisher, J., concurring) ("Given that our substantive due process doctrine has gradually lowered the bar for

7

sense because the Supreme Court's discussion of an increased vulnerability to danger in *DeShaney* occurred only because the young child had previously been in state custody, *see DeShaney*, 489 U.S. at 197–98, yet this Court's state-created-danger doctrine applies regardless of prior state custody, *cf. Bright II*, 443 F.3d at 281. Even so, *en banc* review is not necessary because, as explained above, without satisfying the *Glucksberg* test, the state-created-danger doctrine recognized in *Kneipp* has been invalid since the *Glucksberg* test was announced in 1997. *See Mennen Co. v. Atl. Mut. Ins. Co.*, 147 F.3d 287, 294 n.9 (3d Cir. 1998) ("[Third Circuit Internal Operating Procedure] 9.1 prohibits a panel of this court from overruling a holding of a prior panel expressed in a published opinion. However, this rule gives way when the prior panel's holding is in conflict with Supreme Court precedent."). All subsequent case law relying on a liberty interest in being free from state-created dangers likewise lacks binding precedential force.[5] On that basis, the judgment of the District Court should be affirmed.

---

bringing a state created danger claim, it may be time for this full Court to reexamine the doctrine.").

[5] *E.g.*, *Morse*, 132 F.3d at 907–08; *Brown v. Pa. Dep't of Health Emergency Med. Servs. Training Inst.*, 318 F.3d 473, 476–80 (3d Cir. 2003); *Est. of Smith v. Marasco*, 318 F.3d 497, 506–11 (3d Cir. 2003); *Schieber v. City of Philadelphia*, 320 F.3d 409, 416–18 (3d Cir. 2003); *Rivas v. City of Passaic*, 365 F.3d 181, 194–97 (3d Cir. 2004); *Bright v. Westmoreland County*, 380 F.3d 729, 737–41 (3d Cir. 2004); *Kamara v. Att'y Gen.*, 420 F.3d 202, 216–18 (3d Cir. 2005); *Est. of Smith v. Marasco*, 430 F.3d 140, 153–56 (3d Cir. 2005); *Bright II*, 443 F.3d at 280–83; *Kaucher v. County of Bucks*, 455 F.3d 418, 431–35 (3d Cir. 2006); *Sanford v. Stiles*, 456 F.3d 298, 304–05 (3d Cir. 2006); *Ye v. United States*, 484 F.3d 634, 637–43 (3d Cir. 2007); *Bennett ex rel. Irvine v. City of Philadelphia*, 499 F.3d 281, 287–89 (3d Cir. 2007); *Burella v. City of Philadelphia*, 501 F.3d 134, 146–48 (3d Cir. 2007); *Jiminez v. All Am. Rathskeller, Inc.*, 503 F.3d 247, 255–56 (3d Cir. 2007); *Phillips v. County of Allegheny*, 515 F.3d 224, 235–43 (3d Cir. 2008); *Walter v. Pike County*, 544 F.3d 182, 191–96 (3d Cir. 2008); *Morrow v. Balaski*, 719 F.3d 160, 177–79 (3d Cir. 2013) (en banc); *Henry v. City of Erie*, 728 F.3d 275, 281–86 (3d Cir. 2013); *Est. of Lagano v. Bergen Cnty. Prosecutor's Off.*, 769 F.3d 850, 858–59 (3d Cir. 2014); *Spady v. Bethlehem Area Sch. Dist.*, 800 F.3d 633, 637–38 (3d Cir. 2015); *L.R. v. Sch. Dist. of Phila.*, 836 F.3d 235, 241–50 (3d Cir. 2016); *Mann v. Palmerton Area Sch. Dist.*, 872 F.3d 165, 170–72 (3d Cir. 2017); *Kedra*, 876 F.3d at 436–48; *Haberle v. Troxell*, 885 F.3d 170, 176–78 (3d Cir. 2018); *Sauers v. Borough of Nesquehoning*, 905 F.3d 711,

**B. The State-Created-Danger Doctrine Could Not Apply Here.**

Even if the state-created-danger doctrine could satisfy the *Glucksberg* standard, it would not apply here. At its apogee, the doctrine does not apply to independently created dangers; rather, it requires that a state actor "affirmatively use[] his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all." *Bright II*, 443 F.3d at 281. Here, it was Ryan Miller, not Officer Joseph Wolk, that created the danger that caused his death. Miller chose to flee after Wolk activated his lights and sirens. And Miller continued to flee after Wolk engaged in a high-speed chase. The dangers Miller experienced – including running a red light at high-speed resulting in the crash with a tractor trailer that cost him his life – were the product of his own decision-making as opposed to being placed in a position of vulnerability by a person acting under color of state law.

That conclusion is entirely consistent with the Supreme Court's decision in *County of Sacramento v. Lewis*, 523 U.S. 833 (1998). That case involved a substantive-due-process claim against a police officer brought by the estate of a sixteen-year-old who was a passenger on a fleeing motorcycle killed in a collision with the pursuing police car after the motorcycle crashed. *Id.* at 836–37. Rather than develop a state-created-danger doctrine, the Supreme Court held that a police officer does not violate substantive due process by causing death through deliberate or reckless indifference to life in a high-speed automobile chase aimed at apprehending a suspected offender. *Id.* at 855. It reached that outcome by emphasizing that state actors are not liable for independently caused dangers:

> [T]he police were not to blame. They had done nothing to cause [the motorcyclist's] high-speed driving in the first place, nothing to excuse [the motorcyclist's] flouting of the commonly understood law enforcement

---

717–18 (3d Cir. 2018); *Johnson*, 975 F.3d at 400–02; *Mears v. Connolly*, 24 F.4th 880, 883–86 (3d Cir. 2022).

> authority to control traffic, and nothing (beyond a refusal to call off the chase) to encourage him to race through traffic at breakneck speed . . . .

*Id.*; *see also id.* at 863 (Scalia, J., concurring in the judgment) ("[T]here is no precedential support for a substantive-due-process right to be free from reckless police conduct during a car chase."). Thus, faced with very similar circumstances, the Supreme Court denied a substantive-due-process claim, and it did so without developing even the rudiments of a state-created-danger doctrine. By its own terms, the state-created-danger doctrine, if it validly exists at all, does not apply to independently created dangers.

* * *

For these reasons, I concur only in the judgment.